IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NICOLAS A. COX,

               Plaintiff,

v.                                          Case No. 12-2571-DJW

SHERIFF FRANK DENNING,
DEPUTY CORTRIGHT,
DEPUTY MAHANEY,
DEPUTY PROTHE, and
DEPUTY MARRIOTT,

               Defendants.

## MEMORANDUM AND ORDER

In this removal action, pro se Plaintiff asserts four claims under 42 U.S.C. §1983 for events occurring while he was a pretrial detainee in the custody of the Sheriff of Johnson County, Kansas, being held at the Johnson County Adult Detention Center ("Detention Center"). Specifically, Plaintiff asserts claims for compensatory and punitive damages against Defendant Sheriff Frank Denning, individually and in his official capacity as Sheriff of Johnson County, Kansas, and four deputies, individually and in their official capacities as deputy sheriffs.[1] As the

---

[1] Although Plaintiff's [Third] Amended Petition (ECF No. 88) originally asserted Count Two against a "Deputy John Doe" defendant, Plaintiff never moved to amend his petition to identify the John Doe so that summons and the amended petition could be served.  Plaintiff also does not identify or mention the John Doe defendant in the Final Pretrial Order (ECF No. 147), which supersedes the [Third] Amended Petition. The Court thus considers Plaintiff's failure to identify and serve this defendant, as well as the omission of any reference to the John Doe defendant in the Pretrial Order to mean that Plaintiff has abandoned his claim against the John Doe defendant. *See McCormick v. City of Lawrence, Kan.*, No. 03-2418-KHV, 2006 WL 334658, at *1 n.1 (D. Kan. Feb. 13, 2006) (claims against John Doe defendant deemed abandoned where the plaintiff had not served the summons and complaint, and the pretrial order did not contain any claims against him).

basis for his claims, he alleges Defendants violated his constitutional rights by: (1) revoking his maximum custody "override" (which permitted him to reside in medium custody housing) in retaliation for filing grievances regarding the kosher religious diet; (2) using a female corrections officer to monitor the cameras viewing his cell; (3) enforcing the Detention Center's incoming postcard-only mail policy; and (4) forcing him to take his allowed daily recreation period between midnight and 5:00 a.m.

This matter is currently before the Court on the following motions:  Defendants' Motion for Summary Judgment (ECF No. 120), and Plaintiff's Cross Motion for Summary Judgment (ECF No. 146) on Counts II, III and IV.  The Court also takes up Plaintiff's "Objection of Magistrate [Judge] Ruling" (ECF No. 149), which the Court construes as a motion for reconsideration of the Court's January 14, 2014 denial of his motion to continue the discovery deadline, and Plaintiff's Motion for Appointment of Counsel (ECF No. 155). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

## I.      Facts

The following facts are either uncontroverted or, where controverted, are construed for purposes of summary judgment in the light most favorable to the party opposing the summary judgment motion.[2] Immaterial facts and factual averments not properly supported by the record are omitted.

---

[2] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### A.      Filing of Grievances

Plaintiff was arrested on October 7, 2011, and at all times relevant to the issues in this case was a pretrial detainee in the custody of the Sheriff of Johnson County, Kansas.

The Sheriff's Office strictly prohibits staff from retaliating against inmates for filing grievances.

The Johnson County Sheriff's Office Detention Bureau Inmate Guidebook states that inmates may be subject to disciplinary action for abuse of the grievance procedure.  It also states that abuse or misuse of the inmate grievance procedures, appeal process or Inmate Communication Form is a medium violation.

On October 7, 2011, when Plaintiff was booked into custody, he signed an Inmate Orientation, Rules and Guidelines sheet, which notifies inmates about the grievance process.

On October 7, 2011, when Plaintiff was booked, his initial classification was "maximum custody." Plaintiff continued to be a maximum custody inmate through two more assessments in November 2011 and January 2012; however, the Detention Center staff decided to override this classification to medium custody due to good behavior, but the classification was never changed from maximum custody.

On October 20, 2011, Plaintiff was put on a 30-day observation list to pre-qualify for a kosher diet.  He was eventually approved for a kosher diet and made no complaints about the food for several months.

On February 2, 2012, Plaintiff was found to have been attempting to ferment alcohol in a trash can in his cell, for which he was placed in disciplinary segregation pending investigation of the incident.

On February 22, 2012, because of two recent disciplinary citations including the alcohol incident, Plaintiff was reassessed and Sergeant Mahaney elected to continue the override of his maximum custody classification.  This was communicated to Plaintiff.

In March 2012, Aramark, the independent contractor that supplies food to the Detention Center, switched its kosher meal plan to a "Lacto-Ovo" diet.

On March 22, 2012, Plaintiff submitted grievances that his diet was not kosher.

Around 9:00 a.m. on March 23, 2012, Plaintiff was moved from medium custody to maximum custody, which is a functional revocation of his override.

On March 23, 2012, Plaintiff submitted two more grievances to Aramark about the kosher/Lacto-Ovo diet it served, though these were also treated collectively.

On March 23, 2012 at around 4:30 p.m., Plaintiff was cited with medium violation #209 for misuse of the grievance process.

Sergeant Mahaney explained to Plaintiff in a correspondence dated March 27, 2012, that Plaintiff was not being religiously persecuted and that his override was revoked for rules violations.

Plaintiff received two formal notices of discipline setting forth the basis for the citation and punishment.

On March 27, 2012, Plaintiff was formally sanctioned for the grievances filed between March 22 and 23, 2012.

**B.      Cross-Gender Camera Surveillance**

The Detention Center's policy states that any cross-gender observation will occur only if there is a reasonable need for the safety of the inmate or others.

The Detention Center policy is that all deputies are trained to manage all housing modules and units and will rotate assignments on a regular basis.

9-Side is a segregation wing of the Detention Center that consists of four 12-bed modules. 9-Side is used to house those inmates, regardless of classification, who would be inappropriate to house in general population due to disciplinary issues or administrative reasons, regardless of custody level. 9-Side is monitored from a single location which has the ability to monitor recreation for two inmates at a time. Inmates housed in 9-Side are the most closely monitored in the entire facility, requiring "intense supervision" because they pose a danger to the safety of themselves, other inmates and the facility staff.  Each cell in 9-Side has a camera that is constantly recording and monitored.

Deputy Rowe is a female who has periodically been assigned to monitor the 48 cells in 9-Side.  Deputy Rowe is completely qualified to monitor the 48 cells in 9-Side.

From April 1, 2012 to June 1, 2012, only males were housed in 9-Side.

## C.  Incoming Mail Policies

The Detention Center's incoming mail policy is to accept only postcards, privileged mail, and preapproved letters for incoming mail. Privileged mail is defined in the Inmate Guidebook as "mail received from licensed attorneys."  The Detention Center's Directive: 16-02 defines privileged (legal) mail as mail "received by an inmate from a licensed attorney or the court."  All other mail is considered to be non-privileged mail.

The Detention Center's policy is that any incoming non-privileged mail that violates its rules will be returned to sender without notice to the inmate, but an explanation will be provided to the inmate subsequent to the rejection. The notices Plaintiff received included the name of the

sender of the incoming mail but did not list an address for the sender.  The incoming mail was rejected and returned simultaneously as the notice was written.

Inmates can request the preapproval of non-postcard, non-privileged mail prior to the letter's arrival, a practice of which Plaintiff is aware.  Plaintiff did not request approval of the letters he complains of in this case prior to their arrival.

Plaintiff had non-privileged letters rejected because they were not postcards and were not preapproved.  Four letters sent to Plaintiff were returned to sender due to the Detention Center's mail policy.  The four letters were from SRS,[3] Salvation Army, Prison Activist Resource Center ("PARC"), and Mietler Consulting.  Plaintiff was never able to figure out where the letters from SRS, Salvation Army, and PARC came from because those organizations have many addresses.

Plaintiff was not afforded pre-deprivation remedies on returned mail.  He could only protest or grieve the rejection.  The sender of the returned mail was not given a chance to protest before the mail was returned.

### D.    Nighttime Recreation

The 9-Side unit is the unit in the Detention Center in which Plaintiff was required to take his recreation between midnight and 5:00 a.m.

Inmates are allowed one hour of recreation time daily, unless they request the time be ended early. Otherwise, inmates are in their cells at all other times, except time in the law library, court, and medical.

---

[3] The Court assumes Plaintiff's reference to SRS to mean the Kansas Department of Social and Rehabilitation Services.

Inmates in disciplinary segregation have recreation time between midnight and 5:00 a.m. Inmates in administrative segregation receive recreation during day or evening hours.

On May 8, 2012, Plaintiff's recreation time began at 12:06 a.m. and lasted for 21 minutes. Plaintiff had a state court appearance later that morning at 10:00 a.m.

## II.      Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c)(1) further provides that the party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

"The court need consider only the cited materials, but it may consider other material in the record."[4]  When ruling on a motion for summary judgment, a court must view the evidence and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.[5]

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of

---

[4] Fed. R. Civ. P. 56(c)(3).

[5] *Scott*, 550 U.S. at 378.

law."[6]  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."[7]  If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."[8]  Summary judgment is not a "disfavored procedural shortcut," but is an important procedure "designed to secure the 'just, speedy and inexpensive determination of every action.'"[9]

When the parties file cross motions for summary judgment, the court must analyze each motion individually and on its own merits.[10]  But where the cross motions overlap, the court may address the legal arguments together.[11]  The court is also "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[12]

Plaintiff is proceeding *pro se*. The Court therefore reviews his pleadings, including those related to the present motions for summary judgment, "liberally and holds them to a less

---

[6] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[7] *Id.*

[8] *Id.* (citing *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[10] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

[11] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

[12] *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

stringent standard than those drafted by attorneys."[13] The Court, however, cannot assume the role of advocate for the *pro se* litigant.[14]  Likewise, Plaintiff's *pro se* status does not relieve him from an obligation to comply with procedural rules, including the Federal Rules of Civil Procedure.[15]

## III.   Qualified Immunity Standards

Qualified immunity shields government officials performing discretionary functions from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."[16] The defense of qualified immunity is available only to an official sued in his or her individual or personal capacity, and not to an official sued in his or her official capacity.[17]

In resolving questions of qualified immunity at summary judgment, the court engages in a two-pronged inquiry. The court first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right [.]"[18] This requires the court to decide whether the facts that a plaintiff has alleged or shown make out

---

[13] *Trackwell v. United States Gov't*, 472 F.3d 1242, 1243 (10th Cir. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). *See also Hall v. Bellmon*, 935 F.2d 1106, 1110 n.3 (10th Cir. 1991) ("The *Haines* rule applies to all proceedings involving a pro se litigant, including . . . summary judgment proceedings.").

[14] *Hall*, 935 F.2d at 1110 ("[W]e do not believe it is the proper function of the district court to assume the role of advocate for the pro se litigant.").

[15] *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2002).

[16] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).  *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) (*Harlow's* immunity standard applies in § 1983 actions).

[17] *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985).

[18] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

a violation of a constitutional right.[19] The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the alleged violation.[20] The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional.[21]

Courts have discretion to decide the order in which to examine these two prongs.[22] But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.[23] This is not a rule specific to qualified immunity; it is simply an application of the more general rule that the court's function at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[24] Qualified immunity applies unless the plaintiff can satisfy both prongs of the inquiry.[25]

## IV.    Summary of Plaintiff's Claims

In the Pretrial Order (ECF No. 147), Plaintiff asserts that he is entitled to recover under the following theories:

---

[19] *Pearson*, 555 U.S. at 232.

[20] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

[21] *Id.* at 741 (internal quotes omitted).

[22] *Pearson*, 555 U.S. at 236.

[23] *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

[24] *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[25] *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (citing *Pearson*, 555 U.S. at 232).

**A. Count I - §1983 Retaliation for Protected Conduct**. Plaintiff asserts a claim under 42 U.S.C. § 1983 for violation of his First Amendment right to freedom of speech and Fourteenth Amendment due process rights by revoking his maximum custody "override" (which permitted him to reside in medium custody housing) in response to Plaintiff's grievances disputing a kosher diet.

**B. Count II - Right to Privacy**. Plaintiff asserts a claim under 42 U.S.C. §1983 alleging his Fourth Amendment rights to privacy and Fourteenth Amendment due process rights were violated because Deputy Rowe, a female guard, was periodically assigned to observe the in-cell cameras for the segregated male inmates.

**C. Count III - Right to Communication**. Plaintiff asserts a claim under 42 U.S.C. §1983 alleging his First Amendment rights to freedom of speech and access to the courts and Fourteenth Amendment due process rights were violated because his incoming, non-privileged mail was withheld under the Detention Center's postcard-only mail policy.

**D. Count IV - Cruel and Unusual Punishment**. Plaintiff asserts a claim under 42 U.S.C. §1983 alleging his Eighth Amendment right not to be subjected to cruel and unusual punishment, and his Fourteenth Amendment due process rights were violated because he was forced to take his recreation period between midnight and 5:00 a.m. while in disciplinary segregation, which deprived him of sleep and resulted in him being unaware of court proceedings the following day.

## V.    Plaintiff's Claims

### A.    Count I – Retaliation for Filing Grievances

In Count I, Plaintiff alleges that Deputies Marriott, Mahaney, Prothe, and Cortright retaliated against him for exercising his First Amendment right to file grievances about the changes to the kosher diet served by the Detention Center. Specifically, he alleges that after he submitted a two-page grievance to Aramark, the food service provider, about whether the food was kosher and another grievance to Sergeant Marriott—because Deputy Hostetler instructed him that Sergeant Marriott was in charge of the new kosher diet implementation—Defendants retaliated the next morning by moving him out of his medium custody classification cell and revoking his maximum custody classification "override" (which permitted him to reside in medium custody housing). Plaintiff alleges that at the time he was being moved out of his medium custody cell, deputies told him that he was being moved because he went into another inmate's cell. Plaintiff further alleges that the citation he received for misuse of the grievance process was written after he was moved from the medium to maximum security module.

Defendants deny that the revocation of Plaintiff's maximum classification override was in retaliation for using the grievance process. They assert that the reason for their action in revoking Plaintiff's classification override by moving him from his medium classification cell on the morning of March 23, 2012 was due to Plaintiff abusing the grievance process. They emphasize that the revocation was not due to Plaintiff *using* the grievance process, but that he was *abusing* it by filing multiple grievances over the same subject matter in a short period of time.  According to Defendants, Plaintiff filed three grievances on March 22, 2012, one listed as an "emergency," that the new diet was not kosher. Defendants admit that they treated the

grievances collectively as three separate pages under a single grievance number; however, they point out the grievances were submitted at different times with different complaints.   One grieved whether the diet was kosher and two grieved whether the diet was dietician approved.

Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights.[26] "This principle applies even where the action taken in retaliation would be otherwise permissible."[27]   But "an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity."[28]

To establish a First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct.[29]   When the plaintiff alleges that the defendant's action was taken in retaliation for protected speech, the standard for evaluating that chilling effect on speech is objective, rather than subjective.[30]   Although the objective standard permits a plaintiff who

---

[26] *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998*); Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990).

[27] *Maschner*, 899 F.2d at 948.

[28] *Peterson*, 149 F.3d at 1144.

[29] *Nielander v. Bd. of Cnty Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009); *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007).

[30] *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004).

perseveres despite governmental interference to bring suit, "a trivial or de minimis injury will not support a retaliatory prosecution claim."[31]

Here, Plaintiff alleges that Defendants retaliated against him for filing administrative grievances. The Tenth Circuit has established that the filing of prison grievances is a constitutionally protected activity.[32] Plaintiff has therefore established the first element of his retaliation claim. The Court therefore finds that Plaintiff was engaged in constitutionally protected conduct when he filed administrative grievances on March 22, 2012, pertaining to changes in the kosher diet served by the Detention Center.

The second element of a retaliation claim is that the government's actions caused the plaintiff injury that would chill a person of ordinary firmness from continuing to engage in that activity.[33] Plaintiff claims that after he submitted grievances about the kosher diet, Defendants retaliated by moving him out of his medium custody cell and thereby revoking his maximum custody "override," which had formerly permitted him to reside in medium custody housing.

Defendants argue that Plaintiff suffered no cognizable harm from the revocation of his override because the Detention Center staff did not need *any* reason to move Plaintiff back to

---

[31] *Id.* at 954–55.

[32] *See Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (filing specific grievances against the defendants was constitutionally protected activity); *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) ("[I]f in fact DOC officials retaliated against [the plaintiff] based on his filing administrative grievances, they may be liable for a violation of his constitutional rights."); *Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) ("[T]he jurisprudence prohibiting retaliatory acts against prisoners for reporting grievances is well-established."). *See also Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 747 (10th Cir. 2013) ("Prison officials may not retaliate against or harass inmates because of the inmate's exercise of his constitutional rights, including filing internal prison grievances or initiating lawsuits."); *Allen v. Avance*, 491 F. App'x 1, 7 (10th Cir. 2012) ("a jury could find [the defendant] violated a clearly established constitutional right to be free from retaliation for filing prison grievances.").

[33] *Shero*, 510 F.3d at 1203.

maximum housing because his classification was always as a maximum custody inmate. The loss of his override of that maximum custody classification therefore would not chill a person of ordinary firmness from continuing to engage in that activity. In support of his retaliation claim, Plaintiff alleges that less than sixteen hours after he filed grievances that the new kosher diet being served was not kosher compliant, his medium classification override was revoked and he was removed from his medium custody classification pod and taken to maximum custody.

The Court finds that the alleged government action—the revocation of Plaintiff's maximum classification override so that he would be transferred from medium classification housing to maximum—would "chill a person of ordinary firmness" from continuing to engage in the protected activity of filing grievances. Given the differences in privileges and treatment of medium versus maximum custody classification inmates, a person of ordinary firmness would be deterred from filing grievances by being transferred from medium custody housing to maximum custody housing.  Even though Plaintiff always had a maximum custody classification but was given an override to place him in medium custody housing, this does not negate the injury to him resulting from the revocation of the override. The principle prohibiting retaliation because of the inmate's exercise of his constitutional rights "applies even where the action taken in retaliation would be otherwise permissible."[34]  The question is not whether Defendants had a right to act by revoking his classification override, but whether such action was accomplished for an unlawful purpose.[35] Thus, even though Defendants' revocation of Plaintiff's override was otherwise

---

[34] *Maschner*, 899 F.2d at 948.

[35] *See Price v. Wall*, 428 F. Supp. 2d 52, 56 (D.R.I. 2006) (finding that the defendants' transfer of the plaintiff to a prison with no rehabilitation programs and refusal to upgrade his classification status were adverse actions).

permissible and Defendants had the right to revoke it at any time, Defendants' actions of moving Plaintiff from a medium to maximum custody cell was an adverse action that would "chill a person of ordinary firmness" from continuing to engage in the protected activity of filing grievances.

The third and final element a plaintiff must establish to show retaliation is that the government's actions were "substantially motivated as a response to his constitutionally protected conduct."[36] A plaintiff must allege facts to show that retaliation was the animus behind the defendants' actions, i.e., a plaintiff must show that "but for" a retaliatory motive, the defendants would not have acted as they did.[37]

Plaintiff has presented no direct evidence that the revocation of his medium classification override and transfer to maximum custody housing was motivated by a retaliatory reason. He has, however, presented circumstantial evidence of temporal proximity between his filing grievances and his being moved out of the medium custody pod into a maximum custody area. The record shows that Plaintiff filed at least two grievances regarding the changes to the kosher diet late in the day on March 22, 2012, and that Plaintiff was moved from his medium custody cell at approximately 9:00 a.m. the next morning.  A review of the kosher diet related grievances submitted by Plaintiff on March 22, 2012 (ECF No. 122-12) shows that they consist of three pages, all with the same grievance number (#12GR00311). The first page is an Inmate Communication Form with a submission date and time of March 22, 2012 at 18:30 hours addressed to Aramark (but with Housing Sergeant Marriott's name crossed out). The second

---

[36] *Shero*, 510 F.3d at 1203.

[37] *Peterson*, 149 F.3d at 1144; *Maschner*, 899 F.2d at 949–50.

page is also an Inmate Communication Form directed to Aramark with a submission date and time of March 22, 2012 at 22:00 hours. The third page is also an Inmate Communication Form directed to Aramark (but with Sergeant Marriott's name crossed out) with the same submission date and time (March 22, 2012 at 22:00 hours).

Defendants' Narrative Report (ECF No. 122-13) dated March 23, 2012, states that in a 24-hour period, Plaintiff submitted five separate grievances on the same subject matter. The Narrative Report describes the following chronology of Plaintiff's requests for grievance forms: On March 22, 2012, at approximately 16:30 hours, Plaintiff received a kosher meal tray. Plaintiff was displeased with his kosher meal and asked the module officer for a grievance to Sergeant Marriott. At approximately 17:15 hours, Deputy Hostetler provided Plaintiff with an Inmate Communication Form for grievance addressed to Sergeant Marriott. At approximately 18:00 hours, Plaintiff approached the module officer and asked for—and received—another grievance about the kosher meal to be addressed to Sergeant Marriott. The Report states that Plaintiff then submitted another grievance addressed to Aramark for the same subject matter concerning the kosher meal.

The Narrative Report further states that the next day, March 23, 2012, at approximately 6:30 hours, Plaintiff received his kosher meal tray and then asked the module officer for a grievance to Sergeant Marriott. At his request, an Inmate Communication Form was provided to him at 7:00 hours. Later that day at 12:30 hours, Plaintiff received a kosher meal tray. He was again displeased with the meal and asked the module officer for a grievance addressed to the housing sergeant. Deputy Nuss provided Plaintiff with an Inmate Communication Form at 13:00 hours.

Under these facts, the Court finds that Plaintiff has presented enough circumstantial evidence of temporal proximity between his filing grievances about the kosher meal served on March 22, 2012 and Defendants moving him from his medium custody cell to a maximum custody one, which is the functional equivalent of revoking his maximum classification override. The evidence indicates that Defendants revoked Plaintiff's override at approximately 9:00 a.m. the morning after he requested and submitted either two or three grievances (depending on how they are counted) about the kosher meal tray he received the preceding evening. Plaintiff claims that he submitted only two grievances, a two-page one to Aramark and one to Sergeant Marriott. Defendants claim that Plaintiff submitted five separate grievances and that doing so warranted his citation for misuse of grievance procedure. Under the chronology of events set out in Defendants' own Narrative Report, however, Plaintiff had submitted only three of those grievances before he was moved from his medium custody cell at 9:00 a.m. on March 23, 2012. Defendants also admit that they treated the three grievances he filed on March 22 collectively, even assigning them the same grievance number. Finally, Defendants also did not give Plaintiff his official citation for abusing the grievance process until 4:30 p.m. on March 23, several hours after he was moved from his medium custody cell.

Plaintiff also raises factual issues with respect to the veracity of the asserted reason for revoking his override. He argues that the facility staff had inconsistent and differing explanations for the revocation. He asserts that the Detention Center's grievance policy is a four-step process whereby grievances are submitted first to a sergeant, then to a lieutenant, then to the captain, and finally to the major. He alleges that Defendants have submitted only the sergeant and major's responses because they more closely match Defendants' "story" of why his override was

revoked. He points to two inmate grievance responses he later received, both of which sought for clarification why his override was revoked. Those responses stated that the removal of his override was "due to some safety and security reasons, not due to you filing a grievance about your religious diet."[38]  Another response stated that Plaintiff's override was revoked "to separate you from other inmates as there was an ongoing investigation regarding some events in [cell] 8A. The major citation for abusing the grievance process was a secondary matter."[39] Plaintiff also alleges that when he asked the guards why he was being moved at the time of the event, he was told that it was because he was observed entering another cell, but the cell number the guards allegedly told him he entered was his old cell number.

Plaintiff also raises a factual issue with respect to why he filed multiple grievances. He claims that he filed separate grievances on March 22, 2012 because his grievances previously had been rejected for including more than one complaint in a grievance so he treated the separate meals as separate issues. Plaintiff also claims that Deputy Hostetler suggested that Plaintiff write to Sergeant Marriott because he was the one in charge of implementing the diet and that Deputy Hostetler gave him a grievance to Aramark just in case so that it would get addressed. Plaintiff also alleges that during the five years he has been at the Detention Center, he has never seen an inmate get an override revoked outside of their reclassification date unless the inmate committed a major violation and had to go to 9-Side for disciplinary segregation or had an emergency code called on them.

---

[38] ECF No. 146-1.

[39] ECF No. 146-2.

The Court finds that Plaintiff has sufficiently demonstrated that genuine factual disputes exist regarding Defendants' motivation in revoking Plaintiff's maximum classification override and his removal from his medium custody pod early on March 23, 2012.  Specifically, factual disputes exist as to the exact number, timing, and nature of the grievances filed by Plaintiff on March 22 and 23, 2012; whether Plaintiff filed multiple grievances at the suggestion of staff or because of past experiences; the responses by staff to those grievances; and whether staff gave Plaintiff differing explanations why he was moved from his medium custody cell.  These factual disputes preclude summary judgment on Plaintiff's retaliation claim.

Defendants argue that to the extent Plaintiff is suing them in their individual capacities, they are entitled to qualified immunity. They construe Plaintiff's claim as alleging that Defendant Marriott retaliated against him in his individual capacity and Defendants Mahaney, Prothe, and Cortright retaliated against him by failing to rectify Defendant Marriott's actions, which could be construed as individual capacity or official capacity claims. For qualified immunity to apply to these Defendants in their individual capacities, the Court must decide whether the facts that Plaintiff has shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of Defendants' alleged misconduct.[40]   The Court finds that Plaintiff has sufficiently shown facts that—if proven at trial—would be a violation of his constitutional right to file grievances. The Court concludes that the right at issue—filing grievances—was clearly established at the time Defendants allegedly retaliated against him.  As cited above, the Tenth Circuit has established that the filing of prison

---

[40] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

grievances to be a constitutionally protected activity.[41] The Detention Center's own policies reflect this by prohibiting staff from retaliating against inmates for filing grievances. Qualified immunity is denied for these Defendants in their individual capacity. Defendants' Motion for Summary Judgment as to Plaintiff's Section 1983 retaliation claim (Count I) is therefore denied.

###    B.    Count II – Cross-Gender Camera Monitoring

Plaintiff next asserts a claim under 42 U.S.C. §1983 against Defendant Sheriff Denning and Deputy Cortright, in their individual and official capacities, alleging that his Fourth Amendment rights to privacy and Fourteenth Amendment due process rights were violated by the Detention Center's policy or custom that allows female guards to constantly and continuously view male inmates by monitoring the in-cell cameras.  He alleges that a female guard was periodically assigned to monitor the in-cell cameras for the segregated inmates in 9-Side, where he was housed.  Plaintiff alleges that the camera monitoring his cell has a full, clear view of the entire cell, including the toilet, and the female guard monitoring the camera was in a position to observe him changing clothes and using the toilet daily, thereby violating his constitutional rights to bodily privacy. He argues there is no penological interest in subjecting male inmates to female guards monitoring them in their cells 24 hours a day.

Although the Fourth Amendment does not establish a right to privacy in a prisoner's cell, prisoners do retain a limited constitutional right to bodily privacy, "particularly as to searches viewed or conducted by members of the opposite sex."[42] The constitutionality of prison guards

---

[41] *See* cases cited in footnote 32.

[42] *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995); *Moore v. Atherton*, 28 F. App'x 803, 806 (10th Cir. 2001).  *See also Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) (per curiam) (vacating district court order dismissing action as frivolous and recognizing cognizable constitutional bodily privacy claim based upon female prison guards being assigned to posts where they observe the

observing members of the opposite sex undressed or showering is dependent on the scope of the intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.[43] The Tenth Circuit has noted that an important factor in assessing the constitutionality is the frequency with which prison guards watch inmates of the opposite sex undressing, using toilet facilities, and showering.[44] But even if a prison regulation "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[45] To determine the reasonableness of a prison regulation, the court must consider the four factors set out by the Supreme Court in *Turner v. Safley*:[46] "(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives."[47] A prisoner's constitutional claims must be analyzed with due

---

male inmates undressing and using the toilet and shower). *But see Moore v. Henderson*, 124 F.3d 217 (table), 1997 U.S. App. LEXIS 21205, at *3–4 (10th Cir. 1997) ("The viewing of nude inmates by prison guards of the opposite sex is not per se unconstitutional.") (citing *Somers v. Thurman*,109 F.3d 614, 619–20 (9th Cir. 1997)).

[43] *Matson v. Hrabe*, No. 11-3192-RDR, 2014 WL 273187, at *10 (D. Kan. Jan. 23, 2014) (citing *Hayes*, 70 F.3d at 1147 (referring to factors taken from *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

[44] *See Hayes*, 70 F.3d at 1147 (an analysis of the "frequency with which prison guards watch inmates of the opposite sex undressing, using toilet facilities, and showering is an important factor in assessing the constitutionality of prison practices," although a prisoner's right to privacy may be violated by a single search under certain circumstances) (citing *Cumbey*, 684 F.2d at 714).

[45] *Turner v. Safley*, 482 U.S. 78, 89 (1987).

[46] 482 U.S. 78 (1987).

[47] *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (citing *Turner*, 482 U.S. at 89–90).

regard for the requirements of prison administration; thus, courts must give great deference to prison officials' decisions concerning the management of correctional facilities.[48]

A few cases in the District of Kansas have addressed constitutional claims based upon opposite gender staff viewing nude or showering inmates. In *Thompson v. Wyandotte County Detention*,[49] the court found that the female plaintiff's limited rights to privacy were not violated by being viewed in the nude by male guards because the incidents alleged by plaintiff were more properly characterized as isolated and inadvertent, and were not part of a normal routine.[50] The court held that "viewing of naked prisoners by members of the opposite sex, unless done 'regularly,' does not equate to a violation of privacy."[51]

In another case, *Sandstrom v. Hoffer*,[52] the court dismissed the plaintiff's claim that his rights under the Eighth Amendment were violated because he was sometimes required to shower in the presence of female staff due to staff shortages. The court found that the female staff were placed on the unit due to a staffing shortage and their presence served the legitimate government interest of maintaining an adequate staffing level and thus did not violate his limited right to bodily privacy.[53] "No constitutional violation occurs when naked male inmates are viewed by

---

[48] *See Sandstrom v. Hoffer*, No. 08-3245-SAC, 2011 WL 4553067, at *4 (D. Kan. Sept. 29, 2011) (showering in presence of female staff did not violate Eighth Amendment).

[49] 869 F. Supp. 893, 895 (D. Kan. 1994).

[50] *Id.*

[51] *Id.*

[52] No. 08-3245-SAC, 2011 WL 4553067, at *4 (D. Kan. Sept. 29, 2011).

[53] *Id.*

female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility."[54]

One District of Kansas case that has addressed cross-gender monitoring of prison security cameras is *Hodge v. Topeka Correctional Facility*.[55] In that case, the court found several deficiencies in the plaintiff's claim that her constitutional right to bodily privacy had been violated when she was viewed naked on camera by prison guards of the opposite sex. In a footnote, the *Hodge* court commented:

> First, the right to privacy is clearly subject to reasonable limitations in the prison context, and security cameras are an accepted part of the prison environment. Thus, a bald reference to privacy in a prison cell without more is insufficient. Certainly, prison employees may not use security cameras as a means to improperly view naked inmates of the opposite sex. Courts have held that if guards regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities, or showering, the inmates' constitutional rights to privacy are violated.[56]

The court found it significant that the plaintiff was not viewed in the shower or toilet, but in her cell, and that she and other inmates were expected to wear underclothing and another cover outside the shower area.[57] It found the plaintiff's allegation that she could have been watched over a two-year period was speculation, and she had not alleged that she was regularly viewed in an area where she was allowed to be undressed.[58]

---

[54] *Id.* (citing *West v. Parker*, 68 F.3d 466 (5th Cir. 1995)).

[55] No. 12-3228-SAC, 2012 WL 5831192, at *5 n.3 (D. Kan. Nov. 16, 2012).

[56] *Id.* (citing *Cumbey*, 684 F.2d. at 714).

[57] *Id.*

[58] *Id.*

The Fifth, Seventh, and Eighth Circuits have upheld opposite-sex surveillance of inmates.[59] Several courts have also upheld cross-gender monitoring of cameras.[60] Other cases have found that male prisoners stated colorable constitutional claims based upon being observed by female guards monitoring cameras.[61]

Considering the frequency, scope, manner, and place of the cross-gender observation alleged by Plaintiff, the Court determines the periodic monitoring of Plaintiff's in-cell cameras by a female guard does not rise to the level of a constitutional violation of Plaintiff's limited right to bodily privacy. While it is undisputed that a female guard was periodically assigned to monitor the in-cell cameras and that inmates can occasionally be seen on camera in their cells in states of undress, Plaintiff presented no evidence that the female guard regularly viewed him or

---

[59] *See Oliver v. Scott,* 276 F.3d 736, 746 (5th Cir. 2002) (upholding cross-sex surveillance under *Turner* factors); *Johnson v. Phelan,* 69 F.3d 144, 150–51 (7th Cir. 1995) (holding that mere cross-gender observation does not state a claim under the Fourth, Fifth, or Eighth Amendments); *Timm v. Gunter,* 917 F.2d 1093, 1102 (8th Cir. 1990) ("[W]e are convinced that opposite-sex surveillance of male inmates, performed on the same basis as same-sex surveillance, is not "unreasonable" under the *Turner* analysis. Whatever minimal intrusions on an inmate's privacy may result from such surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, [they] are outweighed by institutional concerns for safety and equal employment opportunities.").

[60] *See Burge v. Murtaugh,* No. 2:07-CV-0336PS, 2007 WL 4335461, at *2 (N.D. Ind. Dec. 7, 2007) (assigning female officers to watch the security camera monitoring male prisoner in his cell or monitoring the shower and restroom facilities did not violate any right to privacy); *Batchelder v. Donahue,* No. 2:07-CV-313, 2007 WL 3256832, at *3 (N.D. Ind. Nov. 5, 2007) (installing surveillance cameras and assigning female officers to watch the cameras did not violate any right to privacy); *Caffey v. Limestone Cnty., Ala.,* 243 F. App'x 505, 508 (11th Cir. 2007) (unpub.) (holding that opposite-sex monitoring by prison guards during twenty-four hour stay in the holding cell, either through the window or the camera, does not amount to a deprivation of the plaintiff's Eighth Amendment rights).

[61] *See Hunter v. Helton,* No. 1:10-CV-00021, 2010 WL 2405092, at *7 (M.D. Tenn. June 10, 2010) (finding that prisoner stated colorable claim based on his allegation his naked body was observable by female correctional officers while monitoring security cameras in the inmate shower area); *Hite v. Embry,* No. 4:09-CV-P73-M, 2010 WL 989158, at *4 (W.D. Ky. Mar. 12, 2010) (allowing prisoner's claim that female guards were allowed to view him on surveillance video while he was naked and using the toilet in his cell).

any other male inmates in their cells while they were undressed or using the toilet. Given the number of cells being monitored by cameras and the number of guards on duty monitoring multiple cells continuously, any viewing of unclothed or toileting males by female staff while monitoring the cell cameras would be brief, isolated, and infrequent. As inmates are required to be clothed while in their cells, any viewing by female staff via the in-cell cameras would be a de minimis intrusion into the limited privacy rights of the male inmates.

Even if the Court were to find that the Detention Center's policy of allowing female staff to monitor in-cell cameras of male inmates impinges on Plaintiff's constitutional right to bodily privacy, the Court finds that the policy is reasonably related to legitimate penological interests under the *Turner* factors. First, a valid and rational connection exists between the Detention Center's policy of allowing cross-gender observation if there is a reasonable need for the safety of the inmate or others and its asserted interest in maintaining a secure facility by deploying available staff resources effectively. The second *Turner* factor also favors Defendants because male inmates have the alternative means of exercising their constitutional right to bodily privacy by positioning themselves away from the camera while undressing and arranging their clothing in such a manner to cover themselves while using the toilet. With respect to the third factor, the Court finds that female staff would be impacted by accommodating the male inmates' right to bodily privacy by not permitting female staff to monitor in-cell cameras. Female staff would be foreclosed from camera monitoring positions and all staff would be impacted by the reduction in overall available staffing resources.  Finally, under the fourth *Turner* factor, an alternative might be having only male staff monitor the in-camera cells of male inmates. Given the deference with which the Court is to consider the Detention Center officials' decisions concerning the

management of the Center, the Court does not find this alternative to be meaningful. As the Supreme Court noted in *Hudson v. Palmer*,[62] "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order."[63] The Court therefore grants summary judgment on Count II in favor of Defendants.

### C.    Count III – Constitutionality of Detention Center's Incoming Mail Policies

In Count III, Plaintiff asserts a claim under 42 U.S.C. §1983 against Defendant Sheriff Denning and Deputies Prothe and Cortright in their official and individual capacities, alleging his First Amendment rights to freedom of speech and access to the courts and Fourteenth Amendment due process rights were violated because his incoming, non-privileged mail was returned to sender under the Detention Center's policies. Plaintiff claims that three aspects of the Detention Center's incoming mail policies are unconstitutional.  Specifically, he argues that the post-card only policy, the incomplete notice for mail returned to sender, and the lack of meaningful appeal process for returned mail are individually unconstitutional.

Defendants argue that, to the extent Plaintiff makes any individual capacity claims, they are entitled to qualified immunity on those claims. Defendants point out there is no caselaw from this Court, the Tenth Circuit, or the United States Supreme Court that clearly establishes the unconstitutionality of a postcard-only mail policy for non-preapproved, non-privileged mail. For qualified immunity to apply to Defendants Denning, Prothe, and Cortright in their individual capacities, the Court must decide whether, under the facts that Plaintiff has alleged, he has shown

---

[62] 468 U.S. 517, 527–28 (1984).

[63] *Id.*

the officer's conduct violated a federal right and whether the right in question was clearly established at the time of the violation.[64]  The Court here agrees with Defendants that the lack of controlling on-point authority regarding the constitutionality of a postcard-only policy means that the right at issue was not clearly established at the time of the alleged events. The Court therefore grants Defendants' Motion for Summary Judgment on Count III as to Defendants Denning, Prothe, and Cortright in their individual capacities.

Having granted summary judgment on the individual capacity claims, the Court next addresses Plaintiff's mail policy claim against Defendants in their official capacities.  Plaintiff has asserted this claim against Defendants Sheriff Denning and Deputies Cortright and Prothe in their official capacities. Plaintiff's claim is therefore equivalent to a claim against the County entity responsible for operating the Detention Center and adopting the postcard-only policy.[65] "[A section 1983] suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same."[66]

In *Monell v. Department of Social Services of City of New York*,[67] the Supreme Court held that when an officer deprives a citizen of a constitutional right, a municipal or other local government body can be sued directly under § 1983 for monetary, declaratory, or injunctive

---

[64] *Tolan v. Cotton*, 134 S. Ct. 1861, 1865–66 (2014).

[65] *See Layton v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, 512 F. App'x 861, 868 n.4 (10th Cir. 2013) (a "suit against [the Sheriff] in his official capacity as sheriff is the equivalent of a suit against [the] County") (quoting *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999)). *See also Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998).

[66] *Watson v. City of Kan. City, Kan.*, 857 F.2d 690, 695 (10th Cir. 1988) (citing *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)).

[67] 436 U.S. 658, 690 (1978).

relief where the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[68] For a plaintiff to hold the local governing body liable under § 1983, the plaintiff must first demonstrate (1) that an officer deprived the plaintiff of a constitutional right, and (2) that the municipal or county policy or custom was the moving force behind the constitutional deprivation.[69] Here, it is undisputed that the Sheriff of Johnson County has adopted and implemented the postcard-only mail policy at the Detention Center, and that Plaintiff is alleging this policy violated his constitutional rights. The Court thus proceeds to address whether Plaintiff's constitutional rights were violated by this mail policy.

"Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison."[70] In *Turner v. Safley*,[71] the Supreme Court established the standard governing the constitutionality of a prison regulation. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

---

[68] *Id.*

[69] *See City of Canton v. Harris*, 489 U.S. 378, 385–88 (1989); *Monell*, 436 U.S. at 694 (government as an entity is responsible under § 1983 when execution of the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury and the official policy is the moving force of the constitutional violation"); *Myers*, 151 F.3d at 1318 ("a plaintiff suing a county under section 1983 for the actions of one of its officers must demonstrate two elements: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.").

[70] *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

[71] 482 U.S. 78, 89–91 (1987).

interests."[72] In determining the reasonableness of the regulation at issue, the court engages in a four-factor analysis of "(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives."[73] The prisoner has the burden to disprove the validity of the prison regulation.[74] In *Thornburgh v. Abbott*,[75] the Supreme Court applied this standard to prison mail regulations restricting prisoners' access to incoming publications. Acknowledging the expertise of the prison administrators and noting the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, the Court afforded "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."[76]

Keeping in mind the deference afforded to county jail administrators, the Court will analyze the *Turner* factors for each aspect of the Detention Center's incoming mail policy that Plaintiff argues is unconstitutional.

### 1. Postcard-Only Policy

Plaintiff argues that the Detention Center's postcard-only policy, which only allows

---

[72] *Id.* at 89 (applying the standard to a regulation which restricted prisoners' access to mail and ability to marry).

[73] *Jacklovich*, 392 F.3d at 426 (citing *Turner*, 482 U.S. at 89–90).

[74] *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Steffey v. Orman*, 461 F.3d 1218, 1222 (10th Cir. 2006).

[75] 490 U.S. 401, 413–14 (1989).

[76] *Id.* at 407–08.

incoming non-privileged, non-preapproved mail to be in the form of a small postcard, is unconstitutional. He argues that the postcard-only policy fails every factor of the *Turner* test and is an exaggerated response to the Detention Center's alleged concerns about security. To warrant deference, Plaintiff asserts that prison officials must present credible evidence to support their stated penological goals.  Plaintiff argues that Defendants have not presented credible evidence to support their claimed penological goals advanced for the postcard-only policy, to prevent contraband from entering the facility and reduce staff time spent inspecting letters for contraband.  He claims that the real reason for the postcard-only policy is so that the staff can read the content of the postcard mail much more quickly, not that they are worried about contraband in letters.

Plaintiff asserts that the postcard-only policy is unreasonable. Under this policy, the amount of information that can be communicated is limited to what can be legibly written on one side of a small postcard.  Plaintiff argues that many organizations that send mail to inmates, such as religious organizations, government agencies, and other organizations that reach out to prisoners, do not have the resources to transfer information that is otherwise on a pamphlet, handout, or other pre-formatted material to the confines of a postcard.  And some mail items cannot reasonably be put onto a postcard, such as a W-2 form or paycheck or stub.

Plaintiff also argues that the postcard-only policy unconstitutionally restricts communications from family members and others who wish to communicate with him.  Due to the expense and restrictions on telephone calls and visits, letters are the most feasible way for family members and others to communicate with inmates. Even assuming family members were somehow made aware of the postcard-only policy, they would be severely limited in the amount

of information that could be legibly written or printed on a postcard, as opposed to the standard 8 by 11 inch sheet of paper.  Plaintiff also argues that postcard-only policy effectively discourages family members from communicating with inmates due to the lack of privacy.  Any information written on the postcard is fully open and visible for anyone to read.  This would discourage family members and others from communicating with the inmate, especially topics of a sensitive or personal nature.

Defendants argue that the Detention Center's postcard-only policy, which only applies to non-privileged mail that is not preapproved, is rationally related to the legitimate interests in security and efficiency and there is no evidence that it is unconstitutional as applied to Plaintiff. They argue that other courts have upheld postcard policies as reasonably related to prison safety and efficiency under the *Turner* analysis.

(a)      **Rational Connection**

Under the first *Turner* factor, the Court considers whether there is a valid, rational connection between the postcard-only policy and the legitimate government interest asserted for it.[77]  The logical connection between the regulation and its asserted goals cannot be so remote as to render the regulation arbitrary or irrational.[78] This requires the Court to determine whether the governmental objective underlying the policy is legitimate, neutral, and whether the policy is

---

[77] *Turner*, 482 U.S. at 89.

[78] *Id.* at 89–90; *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1153 (10th Cir. 2007).

rationally related to that objective.[79] A regulation aimed at furthering prison security, safety, or rehabilitation meets the requirement of a legitimate regulation.[80]

The issue of whether a jail policy that limits incoming non-privileged mail to one side of a small postcard is constitutional has not yet been addressed by the Supreme Court or the Tenth Circuit.  Nor has any District of Kansas case addressed this issue squarely.  Recently, Judge Melgren, in *Jackson v. Ash*,[81] granted a motion for class certification in an action challenging the Wyandotte County Adult Detention Center's policy requiring all non-privileged outgoing and incoming mail to be written on a 5x7 inch postcard.[82]

The Court was able to locate less than ten district court cases to date that have analyzed prison postcard-only mail policies under the *Turner* factors.[83]  Out of those cases, courts in four

---

[79] *Thornburgh*, 490 U.S. at 414.

[80] *Id.* at 415 (prison security); *Salt Lake Cnty.*, 503 F.3d at 1156 (prison safety); *Pell*, 417 U.S. at 823 (rehabilitation).

[81] No. 13-CV-2504-EFM, 2014 WL 1230225 (D. Kan. Mar. 25, 2014).

[82] The docket sheet for the case indicates that the parties have settled the claims therein.

[83] *Prison Legal News v. Cnty. of Ventura*, No. 14-0773-GHK EX, 2014 WL 2736103, at *3–8 (C.D. Cal. June 16, 2014) (granting motion for preliminary injunction and ordering suspension of enforcement of the postcard-only policy for incoming mail); *Prison Legal News v. Chapman*, No. 3:12-CV-00125 CAR, 2014 WL 4247772, at *4–5 (M.D. Ga. Aug. 26, 2014) (entering judgment after bench trial finding postcard-only policy passes constitutional muster under *Turner* analysis); *Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1081–88 (D. Or. 2013) (findings of fact and conclusions of law after bench trial invalidating jail postcard-only policy under *Turner* factors); *Prison Legal News v. Bezotte*, No. 11-CV-13460, 2013 WL 1316714, at *3–5 (E.D. Mich. Mar. 29, 2013) (denying motion for preliminary injunction finding postcard policy constitutional under the *Turner* factors); *Althouse v. Palm Beach Cnty. Sheriff's Office*, No. 12–80135–CIV, 2013 WL 536072, at *4–6 (S.D. Fla. Feb. 12, 2013) (granting summary judgment and finding postcard-only policy constitutional under *Turner* factors); *Daniels v. Harris*, No. 3:11-cv-45(CAR), 2012 WL 3901646, at *5–6 (M.D. Ga. Aug. 8, 2012) (granting unopposed motion for summary judgment finding postcard-only mail policy did not violate constitutional rights); *Gieck v. Arpaio*, No. CV07-1143-PHX-NVW, 2008 WL 2604919, at *4–8 (D. Ariz. June 23, 2008) (granting summary judgment finding jail's postcard-only policy constitutional); *Covell v. Arpaio*,

districts[84] have found the specific postcard-only policy to be constitutional, while courts in the two other districts[85] have found postcard-only policies unconstitutional. One of the first courts to address prison postcard-only policies was the District of Arizona in *Gieck v. Arpaio*,[86] where the court found the Maricopa County jail's prison postcard-only policy to be constitutional under the *Turner* factors. Cases decided in the District of Arizona since *Gieck* have upheld similar or the same Maricopa County postcard-only policies.[87] The Middle District of Georgia has also addressed the issue in *Daniels v. Harris*,[88] and then more recently in *Prison Legal News v. Chapman*.[89] In *Daniels*, the court, in ruling on an unopposed motion for summary judgment, found the pro se plaintiff failed to put forth sufficient evidence to establish the Walton County Jail's postcard-only mail policy violated his constitutional rights.[90] The court in *Chapman* similarly held, after a bench trial, that the Walton County Jail's challenged postcard-only policy

---

662 F. Supp. 2d 1146, 1148 (D. Ariz. 2009) (finding postcard policy constitutional under the *Turner* factors).

[84] Those district court are the District of Arizona, Middle District of Georgia, Southern District of Florida, and Eastern District of Michigan. *See Gieck*, 2008 WL 2604919 (D. Ariz. June 23, 2008); *Covell*, 662 F. Supp. 2d 1146 (D. Ariz. 2009); *Daniels*, 2012 WL 3901646 (M.D. Ga. Aug. 8, 2012); *Chapman*, 2014 WL 4247772 (M.D. Ga. Aug. 26, 2014); *Althouse*, 2013 WL 536072 (S.D. Fla. Feb. 12, 2013); and *Bezotte*, 2013 WL 1316714 (E.D. Mich. Mar. 29, 2013).

[85] *Ventura*, 2014 WL 2736103 (C.D. Cal. June 16, 2014) and *Columbia Cnty.*, 942 F. Supp. 2d 1068 (D. Or. 2013).

[86] 2008 WL 2604919, at *4–8 (D. Ariz. June 23, 2008).

[87] *Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1148 (D. Ariz. 2009). (finding Maricopa County Jail's postcard policy constitutional under the *Turner* factors); *Gamble v. Arpaio*, No. 12-0790-PHX-GMS, 2013 WL 5890730, at *4 (D. Ariz. Nov. 4, 2013) (recognizing the Maricopa County Jail's postcard-only policy as constitutional under *Covell* and *Gieck*).

[88] No. 3:11-cv-45(CAR), 2012 WL 3901646, at *5–6 (M.D. Ga. Aug. 8, 2012).

[89] No. 3:12-CV-00125 CAR, 2014 WL 4247772, at *3–5 (M.D. Ga. Aug. 26, 2014).

[90] 2012 WL 3901646, at *5–6.

34

passed constitutional muster under the *Turner* analysis.[91] In the Southern District of Florida, in *Althouse v. Palm Beach County Sheriff's Office*,[92] the court granted summary judgment against a pro se plaintiff finding that the jail's postcard-only policy was constitutional under the *Turner* factors. Except for *Chapman*, the most recent case to date is from the Eastern District of Michigan, *Prison Legal News v. Bezotte*,[93] wherein the court denied a motion for preliminary injunction, finding the challenged prison postcard policy constitutional under the *Turner* factors.

In contrast, two district courts have found jail postcard-only mail policies to be unconstitutional under the *Turner* factors. In *Prison Legal News v. Columbia County*,[94] the District of Oregon, after a bench trial, held that the county jail's policy prohibiting inmates from receiving mail that was not on a postcard violated the First Amendment under the *Turner* factors. Likewise, in *Prison Legal News v. County of Ventura*,[95] the Central District of California granted a motion for preliminary injunction and ordered suspension of enforcement of the postcard-only policy for incoming mail. In those cases, the courts concluded that the postcard-only policies failed to satisfy *Turner*'s rational relationship factor. The *Columbia County* court found "[i]n the absence of evidence demonstrating an inmate mail security problem, and without a credible

---

[91] 2014 WL 4247772, at *3–5.

[92] 2013 WL 536072, at *4–6.

[93] 2013 WL 1316714, at *3–5.

[94] 942 F. Supp. 2d 1068, 1081–88 (D. Or. 2013). *See also Prison Legal News v. Columbia Cnty.*, No. 3:12-CV-00071, 2012 WL 1936108, at *8–12 (D. Or. May 29, 2012) (granting the plaintiff's motion for preliminary injunction and ordering the defendants to refrain from restricting all incoming and outgoing inmate personal mail to postcards only). All further references to *Columbia County* herein will be to the court's findings of fact and conclusions of law following the bench trial, 942 F. Supp. 2d 1068, 1081–88 (D. Or. 2013).

[95] 2014 WL 2736103, at *3–8.

explanation of why a postcard-only policy is more effective at preventing the introduction of contraband than opening envelopes and inspecting their contents, the . . . postcard-only policy is not rationally related to enhancing jail security."[96] It further found there was no "intuitive common-sense connection between the postcard-only policy and enhancing jail security."[97] Similarly, in *Ventura*,[98] the court found the first *Turner* factor tipped in favor of the plaintiff as the defendants had not met their burden of presenting sufficient evidence to show why a postcard-only policy is more effective at preventing the introduction of contraband than opening envelopes and inspecting their contents.[99] When the court compared the postcard-only policy to the County's prior policy of subjecting incoming mail to a routine, industry-standard inspection, the *Ventura* court found the "rational relationship between the postcard-only policy and enhancing security dissolves."[100]

> Given that contraband can be interdicted by inspecting all incoming mail, the connection between the postcard-only policy and the County's goal of reducing contraband is tenuous at best. While the postcard-only policy may theoretically reduce the risk of contraband entering the jail—simply because envelopes offer more creases and folds for smuggling, and no inspection system is foolproof—this mere theoretical possibility is insufficient to rebut [the plaintiff's] evidence that letter mail does not pose a legitimate security threat. Absent any evidence that affirmatively shows that the postcard-only policy enhances jail security, we conclude the postcard-only policy smacks of arbitrariness and irrationality.[101]

---

[96] *Columbia Cnty.*, 942 F. Supp. 2d at 1084.

[97] *Id.* at 1083.

[98] 2014 WL 2736103, at *4–5.

[99] *Id.* at *4.

[100] *Id.*

[101] *Id.* at *5.

In this case, Defendants assert that the Detention Center's two primary objectives in adopting the postcard-only policy in 2009 were to ensure safety and efficiency. Security and the safety of staff and inmates at the Detention Center is clearly a legitimate penological objective.[102]   The critical inquiry under the first factor is whether the postcard-only policy is rationally related to the legitimate penological interests of security and safety. A "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."[103] Although the Court must uphold a regulation that bears a rational relationship to a legitimate penological interest, this standard "is not toothless."[104] "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."[105]

### i.        Security and Safety Interest Advanced for Postcard-Only Policy

Defendants argue that the purpose of the postcard-only policy is to prevent smuggling contraband into the Detention Center and that the policy clearly rationally related to that end, particularly given the deference afforded to the Center's professional judgment. Defendants state that Detention Center staff are not concerned with the content of the correspondence and have no interest in stifling free expression. They contend the postcard-only policy is clearly rationally related to security by reducing the entry of contraband in incoming letter mail.  They submit the affidavit of Lieutenant Barton, in which she states that the "Sheriff's Office determined that the

---

[102] *Abbott*, 490 U.S. at 415 (the "legitimacy of the Government's purpose in [protecting prison security] is beyond question").

[103] *Turner*, 482 U.S. at 89–90.

[104] *Abbott*, 490 U.S. at 414.

[105] *Beard v. Banks*, 548 U.S. 521, 535 (2006).

postcard policy would allow it to deliver safer mail to the expanding number of inmates without having to increase staff." [106]   Defendants further argue that the experience of the facility staff is that it is easier to hide contraband in letters than in postcards. Envelopes and folded paper offer many more places to conceal items and substances than a single flat postcard.

Defendants, however, fail to present a credible explanation of how the postcard-only policy is more effective at preventing the introduction of contraband than the former policy of opening envelopes and inspecting the contents for contraband. Defendants do not state that there was a problems with contraband in letters.  The Court finds the timing of Detention Center's change to its mail policy in March 2009, coincidental to the timing of other county jails[107] changing their mail policies and the 2008 *Gieck*[108] opinion upholding a postcard-only mail policy, suggests that the adoption of the policy was not due to increased threats to safety from contraband in letters but for other non-security-related reasons. Defendants admit that the Detention Center's postcard policy is modeled in part after the postcard-only policies adopted in Pima, Gila, and Maricopa counties in Arizona. Defendants do not argue or present any evidence that the Detention Center's change in its long-standing mail policy was due to an increase in the amount of contraband being found in letters or threats of this occurring or that the Detention Center had experienced any problems with contraband entering the Center undetected through letter mail, which would warrant the change in its mail policy in 2009.

---

[106] Barton Aff. ¶ 10 (ECF No. 144-4).

[107] *See Jackson*, 2014 WL 1230225, at *1 (Wyandotte County, Kansas Adult Detention Center instituted its postcard-only policy on or about June 9, 2009).

[108] 2008 WL 2604919, at *4–8.

In the *Columbia County*[109] and *Ventura*[110] cases, the courts compared the respective jails' postcard-only policy to their prior policy of subjecting incoming mail to a routine, industry standard inspection. It found that when it made a comparison, "the rational relationship between the postcard-only policy and enhancing security dissolves." In *Harris*,[111] the court found that defendant Harris had shown a rational connection between the postcard mail policy and the jail's concerns regarding contraband. This was based however upon evidence consisting of defendant Harris testifying that the jail had encountered several problems with inmates receiving contraband from outside the prison. Unlike the jail official in *Harris*, Defendants have offered no evidence of instances or increased threats of incoming contraband in letter mail, which would provide a rational explanation for the policy.

Defendants argue that the Court should not rely on the *Columbia County*[112] court's analysis in evaluating the policy here because the facts are distinguishable in that the policy in *Columbia County* was more restrictive and for less mail. While the two postcard-only mail policies may be different, the Court finds the analysis in *Columbia County* persuasive. The Court agrees with the rationale of the *Columbia County* case that a postcard-only policy for incoming mail is not rationally related to the stated objectives of enhancing jail security if Defendants fail to present any evidence relating to their security needs, threats, or experience. Merely accepting Defendants' argument of a rational relationship without any evidence or a

---

[109] 942 F. Supp. 2d at 1083.

[110] 2014 WL 2736103, at *4.

[111] 2012 WL 3901646, at *5.

[112] 942 F. Supp. 2d 1068.

logical explanation of why the postcard-only policy advances a particular legitimate penological interest would render the standard toothless, which the Supreme Court has cautioned against.[113] A policy cannot be upheld where the logical connection between the regulation and the asserted goal "is so remote as to render the policy arbitrary or irrational."[114] The Court concludes that Defendants here have not presented any evidence supporting a *valid, rational* connection between the Detention Center's postcard-only policy and the security or safety interest advanced for it.

### ii.       Efficiency as Interest Advanced for the Postcard-Only Policy

Defendants also assert efficiency as a legitimate penological interest behind the postcard-only policy.  They argue that the postcard-only policy is more efficient because they reasonably believed that it offers a reduction in the time it takes to inspect mail for contraband and results in a net reduction in the overall processing time, saving Detention Center's resources. In support of their argument that the postcard-only mail policy is rationally related to efficiency, Defendants attach the affidavit of Lieutenant Barton.[115]  She states in her affidavit that the postcard-only policy was adopted in March 2009.  At that time, the Sheriff's Office housed approximately 530 inmates at its two facilities with another 150 inmates temporarily housed at other Kansas facilities.[116] In early 2009, inmates received on average 147 pieces of mail per day that were not

---

[113] *Abbott*, 490 U.S. at 414.

[114] *Turner*, 482 U.S. at 89–90.

[115] Barton Aff. (ECF No. 144-4).

[116] Barton Aff. ¶¶ 5–7.

privileged or preapproved mail, magazines, or newspapers.[117] Much of the mail the inmates receive is unsolicited mail.[118] In 2013, the average daily population was 650 inmates between two facilities with the average time in custody for an inmate of only 17 days.[119] Under the old mail policy, which required at least four officers, mail was delivered to the courthouse and initially scanned in bulk through a machine, then searched for contraband and any contraband removed, including preparing notification to inmates of any discovered contraband, then picked up by staff, stamped, and transported to the modules for distribution.[120]

Plaintiff argues that Defendants have not submitted evidence showing any impact on the Center's resources by the postcard-only policy. He also argues the Kansas Department of Corrections and thousands of other institutional around the country allow letters and this shows the burden of allowing letter mail to be minimal. He points out that if the Center had an average inmate stay of only 17 days, then how are inmates getting all the allegedly unsolicited mail Defendants claim. He also asserts that if the only difference between the process between a postcard and an envelope inspection is that the envelope has to be opened and searched inside and out, then it would not take much more than a few minutes to check a letter as opposed to a postcard for contraband. He hypothesizes that if it takes at least four officers six hours each day to open 147 pieces of mail, then that would mean it takes the officers almost ten minutes to open each piece of mail.

---

[117] Barton Aff. ¶ 12.

[118] Barton Aff. ¶ 9.

[119] Barton Aff. ¶ 8.

[120] Barton Aff. ¶ 11.

Defendants argue that Plaintiff vastly underestimates the time it takes to search a letter and the inside of an envelope in comparison with a postcard. An envelope has to be carefully opened, searched, sorted through, and put back together while a postcard only requires a surface inspection. Under the postcard-only policy, the staff were able to quickly analyze all non-preapproved, non-privileged mail, which saved them considerable time and reduces the chance of human error in the process, increasing the safety of the facility.

While safety and security are the legitimate penological interests most often advanced for a jail's postcard-only policy, the Court questions whether efficiency and conservation of jail resources is a legitimate penological interest under the *Turner* standard.  The Supreme Court has identified traditional penological interests as institutional security, rehabilitation of prisoners, and deterrence of crime.[121] The Tenth Circuit appears to recognize efficiency along with safety as a legitimate penological interest under *Turner*.[122] Other Circuits appear to have relied upon efficiency as a legitimate penological interest in their *Turner* analysis.[123]  But one district court has questioned whether the need for efficiency should be advanced as a legitimate penological

---

[121] *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Procunier v. Martinez*, 416 U.S. 396, 412 (1974), overruled in part by *Thornburgh v. Abbott*, 490 U.S. 401 (1989). The Supreme Court has used other terms that are synonymous with this list. *Bell v. Wolfish*, 441 U.S. 520, 539, 546 (1979) ("punishment," "retribution," "order," and "discipline").

[122] *See Barney v. Pulsipher*, 143 F.3d 1299, 1313 n.17 (10th Cir. 1998) (policy of keeping women in solitary confinement reflects a legitimate and rational decision to provide for "the safety of inmates and the efficient running of the jail").

[123] *See, e.g., Davidson v. Mann,* 129 F.3d 700, 702 (2d Cir. 1997) (valid and rational connection between the regulation and Department of Correction's interests in avoiding a backlog of mail and in allocating prison personnel efficiently); *McMican v. Lewis,* 48 F.3d 1228 (table), 1995 U.S. App. LEXIS 3635, at *4 (9th Cir. 1995) (policy requiring inmate identification numbers on non-legal mail logically related to the government's interest in promoting accuracy and efficiency in the delivery of mail to inmates); *Smith v. Erickson,* 961 F.2d 1387, 1388 (8th Cir. 1992) (prison-envelope-only policy had a logical connection to the asserted purposes of efficiency and security).

interest under the *Turner* factors justifying impinging on the First Amendment rights of prisoners.[124]   In *Bezotte*, the court commented that although it could not completely appreciate the day-to-day hardships of maintaining a safe and secure facility on dwindling resources, "the protections of the Constitution should not submit to the need for efficiency."[125]

While the Court questions whether efficient jail management should be a legitimate penological interest that Defendants can advance for the postcard-only mail policy under the *Turner* factors, the weight of authority appears to recognize efficiency is a legitimate interest. Even if efficient jail management is a legitimate interest, however Defendants have not demonstrated that a logical, rational relationship exists between the Detention Center's postcard-only mail policy and efficiency. While the policy would reduce the amount of mail that would need to be opened and inspected, more staff time would be required to prepare the notices for the mail returned or rejected under the policy. It seems likely that more time would be spent by Detention Center staff rejecting mail and preparing a notice to the inmate than it would take to inspect the envelope and letter for contraband.  Defendants have not provided any evidence as to the amount of time it would take a staff to open an envelope for inspection, as opposed to reviewing a postcard. Nor have they provided any evidence of how much time is spent by staff preparing notices for the mail rejected under the postcard-only policy, or the time spent checking to see if the letter has been preapproved.

Defendants attempt to use statistics to support their claim that the postcard-only policy is more efficient. Using Defendants' statistic of an average of 147 pieces of non-privileged mail per

---

[124] *Bezotte*, 2013 WL 1316714, at *4.

[125] *Id.*

day for an average population of 650 inmates would not even amount to one piece of mail for each inmate. Instead, it would mean that roughly one out of every four inmates receives one piece of non-privileged mail each day. And, as Plaintiff points out, the average stay of an inmate at the Detention Center is 17 days. With such a transient population, it is unlikely that inmates would receive many non-privileged letters during their short stay.

The Court therefore concludes on balance that the postcard-only policy fails to satisfy the rational relationship factor under the *Turner* analysis. Even though the first *Turner* factor is mandatory,[126] the Court will analyze the other three *Turner* factors.

### (b)      Alternative Means of Exercising the Right

The second *Turner* factor requires the Court to ask "whether there are alternative means of exercising the right that remain open to prison inmates."[127]   The right in question must be viewed "sensibly and expansively" so as to encompass different practical alternatives that satisfy the same broad underlying function.[128] "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation."[129] But the alternatives

---

[126] *See Parkhurst v. Lampert*, 339 F. App'x 855, 860–861 (10th Cir. 2009) ("The first [*Turner*] consideration is mandatory").

[127] *Turner*, 482 U.S. at 90; *accord Salt Lake Cnty.*, 503 F.3d at 1153.

[128] *Thornburgh*, 490 U.S. at 417; *accord Salt Lake Cnty.*, 503 F.3d at 1153.

[129] *Turner*, 482 U.S. at 90.

44

need not be ideal or the best method from the inmates' point of view; they need only be available.[130]

Defendants argue that the option to request preapproval to receive non-postcard letters is a sufficient alternative. They argue that the Detention Center allows non-privileged letters if they are approved in advance.

Plaintiff argues that the process referenced by Defendants for an inmate to request approval for non-postcard letters is not a sufficient alternative because approval is for a one-time-only basis.  Also, obtaining preapproval requires that the inmate know in advance of incoming mail from a particular person or organization. According to Plaintiff, it is therefore virtually impossible to obtain approval for non-postcard letters because inmates frequently do not know who or when someone will be sending them mail so that they can request preapproval in advance for the incoming letter.

Based upon a review of the Detention Center's Inmate Guidebook section for mail communication,[131] the Court does not find any statements reflecting the Detention Center's alleged policy of allowing an inmate to request preapproval for non-postcard letters.  Neither does the Inmate Mail Directive 16-02 mention any mail preapproval process. Plaintiff apparently agrees the Detention Center has a policy of allowing inmates to request preapproval for non-postcard, non-privileged mail. Plaintiff claims, however, that this policy is limited to requesting preapproval for letters for one time only. In response to an inmate communication form in which Plaintiff requested preapproval for 4 agencies (NAMI-State Mental Health Agency, KU Law

---

[130] *Salt Lake Cnty.*, 503 F.3d at 1153 (citing *Wardell v. Duncan*, 470 F.3d 954, 961–62 (10th Cir. 2006)).

[131] ECF No. 122-1 at 29–30.

School, Kansas Legal Services, and Kansas Board of Healing Arts), Plaintiff was "approved to receive a letter from these groups on a one time only basis."[132]  This supports Plaintiff's claim that the Detention Center's preapproval process has been limited to a one-time only basis. Defendants do not offer any evidence that Plaintiff can request preapproval for multiple non-postcard letters from the same sender. Nor do they controvert the evidence presented by Plaintiff that requests for preapproval for non-postcard letters are limited to a one-time-only basis. The Court finds that the postcard-only policy severely restricts Plaintiff's First Amendment right to receive information while being detained in jail and the preapproval option is not a sufficient alternative means for Plaintiff to exercise that right.

The postcard-only policy not only restrains the First Amendment rights of Plaintiff, it also inhibits rehabilitation. Plaintiff makes a valid point that family is an important part of the rehabilitative process and mail is very important to inmates and their families. It is particularly important to pretrial detainees to have good communication with family and friends as they are the ones who will help Plaintiff after he is released find employment, a place to live, transportation, and re-establish relationships, which all go toward the goal of rehabilitation. In *Bezotte*, although the court found the majority of the *Turner* factors favored upholding the jail's postcard-only policy, it was "mindful that the penal system is purposed for retribution *and* rehabilitation.  The rehabilitation of inmates is as dependent on valuable contact with those on the outside as it is on the general penal experience on the inside."[133] The *Bezotte* court cited the Supreme Court's *Procunier v. Martinez* opinion wherein it noted that "the weight of professional

---

[132] ECF No. 122-28.

[133] *Bezotte*, 2013 WL 1316714, at *4 (emphasis in original) (citing *Procunier v. Martinez*, 416 U.S. 396, 412 (1974), overruled in part by *Thornburgh v. Abbott*, 490 U.S. 401 (1989)).

opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation."[134]

In addition to foreclosing many forms of written communication, the Detention Center's postcard-only policy would certainly discourage family and friends from sending written communications to Plaintiff. Even if the sender was aware of the postcard-only policy, the sender would likely be discouraged from corresponding with the inmate due to the lack of space to write information on a postcard.  The amount of information that can be written on a small postcard is significantly less than what can be written a standard eight by eleven inch piece of paper mailed in an envelope. Even more of a deterrent to a sender would be the lack of privacy from writing on a postcard. A sender would reasonably and obviously be deterred from writing about personal family matters, romantic relationships, health and medical treatment, finances, and legal matters, given that, when written on postcards, the information may be easily read by a number of people, both inside and outside the Detention Center. The *Bezotte* court noted in its analysis of the second *Turner* factor that "[r]equiring inmates and those on the outside to fit everything into a postcard—broadcasting all information contained on it to the world—robs the inmates and non-inmates of the meaningful expression that the Constitution protects."[135]

Even though written correspondence is not completely foreclosed, the First Amendment rights of Plaintiff are severely curtailed under the Detention Center's postcard-only policy and there are no practical alternative means for exercising those rights. Accordingly, the second

---

[134] *Martinez*, 416 U.S at 412.

[135] *Bezotte*, 2013 WL 1316714, at *4.

*Turner* factor supports the conclusion that the postcard-only policy unreasonably infringes upon Plaintiff's First Amendment rights.

(c)      <strong>Impact of Accommodation</strong>

The third *Turner* factor is the impact that accommodating the asserted constitutional right would have on guards, other inmates, and prison resources.[136]  According to Turner, "courts should be particularly deferential to the informed discretion of corrections officials" when accommodating a constitutional right that will have "have a significant 'ripple effect' on fellow inmates or on prison staff."[137] In *Turner*, the Court found that allowing certain inmate-to-inmate correspondence could "be exercised only at the cost of significantly less liberty and safety" for inmates and staff generally and, therefore, the court upheld certain restrictions on such correspondence.[138] The third factor often weighs heavily when courts consider mail policies that restrict potentially disruptive content, such as depictions or descriptions of violence, escape, or criminal activity, sexually explicit materials, and role-playing games, or where the challenged regulation saves the prison substantial resources.[139]

In *Jones v. Salt Lake County*,[140] the Tenth Circuit determined the constitutionality of certain mail regulations at the county jail and state prison. In examining the impact that

---

[136] *Turner*, 482 U.S. at 90; *Salt Lake Cnty.*, 503 F.3d at 1153.

[137] *Turner*, 482 U.S. at 90.

[138] *Id.* at 92–93.

[139] *Columbia Cnty.*, 942 F. Supp. 2d at 1086 (internal citations omitted).

[140] 503 F.3d 1147.

accommodation of the asserted constitutional right would have on the facility's guards, other inmates, and prison resources, it quoted *Turner*:

> In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.[141]

In *Ventura*,[142] the defendant argued that the inevitable consequence of accommodation—allowing inmates to receive letter mail—was to reduce safety for everyone in the jail because, without the postcard-policy, inmates will have unrestricted access to contraband-filled mail containers. The *Ventura* court found the argument disingenuous, reasoning that if the postcard-only ban was rescinded, inmates would not suddenly have unrestricted access to mail containers filled with contraband, but instead jail staff would inspect incoming mail and dispose of any contraband.[143]

Here, the Court is not convinced that rescinding the postcard-only policy and allowing letters will have much, if any, "significant ripple effect" on staff and other inmates or the allocation of prison resources. Presumably, the Detention Center would just return to how it handled incoming non-postcard letters before 2009 when it implemented the postcard-only policy. With regard to allocation of prison resources, the Court finds that any time-savings resulting from the postcard-only mail policy, when factoring in staff time spent preparing notices of returned or rejected non-postcard mail, would likely be insignificant. Accordingly, the third

---

[141] *Id.* at 1153 (quoting *Turner*, 482 U.S. at 90).

[142] 2014 WL 2736103, at *6–7.

[143] *Id.* at *6.

*Turner* factor supports the conclusion that the postcard-only policy unreasonably infringes upon Plaintiff's First Amendment rights.

### (d)     Absence of Ready Alternatives

The fourth and final *Turner* factor is "whether obvious, easy alternatives exist that fully accommodate inmates' rights at de minimis cost to valid penological interests. If so, the regulation may not be reasonable but an 'exaggerated response' to prison concerns."[144] "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable method of accommodating the claimant's constitutional complaint."[145] Rather, this factor weighs against the regulation if the inmate "can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests."[146]

The obvious and easy alternative to the postcard-only policy is to allow incoming non-privileged letters but inspect them for contraband, which was the Detention Center's mail policy before 2009. Defendants have made no showing that re-implementing its inspection system for letters would impose any inordinate safety or administrative costs. The Federal Bureau of Prisons, as well as many state correctional systems across the country, including the Kansas Department of Corrections, appear to allow letter mail without compromising security. Thus, opening letters and inspecting their contents is an easy and obvious alternative to the Detention Center's postcard-only policy. This suggests that the Detention Center's postcard-only policy is

---

[144] *Salt Lake Cnty.*, 503 F.3d at 1154 (quoting *Turner*, 482 U.S. at 90).

[145] *Id.* at 90–91.

[146] *Wardell*, 470 F.3d at 962 (quoting *Turner*, 482 U.S. at 91).

an exaggerated response to Defendants' claimed concerns about the smuggling of contraband in letter mail.

In summary, the Court concludes that the Detention Center's postcard-only policy, analyzed under the four *Turner* factors, is not rationally related to the legitimate penological interests asserted by Defendants and impermissibly infringes upon the First Amendment rights of Plaintiff.

Because the Court has found the Detention Center's postcard-only policy to be an impermissible infringement of Plaintiff's constitutional rights, the Court need not address the other related aspects of the mail policy that Plaintiff alleges are unconstitutional, i.e., the lack of adequate notice for returned mail or the lack of an appeals procedure for returned or rejected mail under the postcard-only policy.

### 2. Damages

Having found the Detention Center's postcard-only policy impermissibly infringes upon the constitutional rights of Plaintiff, the Court next addresses the relief sought by Plaintiff. Damages are available for violations of § 1983 "to compensate persons for injuries caused by the deprivation of constitutional rights."[147] A damages award must be based on actual injuries;[148] "the abstract value of a constitutional right may not form the basis for § 1983 damages."[149]

In his Third Amended Petition, Plaintiff requests compensatory damages in the amount of $1,000 per letter for a total of $4,000 for the four rejected letters against each of Defendants

---

[147] *Carey v. Piphus*, 435 U.S. 247, 254 (1978).

[148] *Id.* at 264.

[149] *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986); *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1214 (10th Cir. 1999).

Denning, Cortright, and Prothe. He requests punitive damages for the willful and wanton violation of his due process rights in the amount of $5,000 against each of these three Defendants. However, in the Pretrial Order, which supersedes Plaintiff's Third Amended Petition, Plaintiff requests compensatory damages in the amount of $26,000 against Defendant Cortright and $16,000 against Defendants Prothe and Denning.  He requests punitive damages in the amount of $15,000 against Defendant Prothe and $16,000 against Defendants Cortright and Denning. Plaintiff submits no evidence regarding his claimed damages in his summary judgment motion or briefing.  The Court will, therefore, defer ruling on the issue of Plaintiff's damages related to Count III and will take up that issue at the January 20, 2015 court trial.

> ### D.     Count IV – Claim Based on Being Forced to Take Nighttime Recreation

In Plaintiff's final claim under 42 U.S.C. §1983, he alleges that his Eighth Amendment rights not to be subjected to cruel and unusual punishment, as well as his due process rights under the Fourteenth Amendment, were violated by Defendants Sheriff Denning and Deputies Prothe and Cortright by their actions in repeatedly waking him to take his one hour of daily allotted recreation time between the normal sleep hours of midnight and 5:00 a.m. Plaintiff argues that this is an inappropriate method of punishment on pretrial detainees. He also argues that forcing him to take his recreation time between midnight and 5:00 a.m. caused him to be sleep deprived and exhausted, which interfered with his ability to "think straight" and present his oral argument at his May 8, 2012 state court appearance.

Defendants admit that Plaintiff's sleeping conditions may not have been ideal while he was in 9-Side's disciplinary segregation, but such difficulties in operating a jail facility do not amount to a constitutional violation. They argue the Plaintiff has no protected constitutional

interest in the time of day at which he is offered a recreation period, particularly, when he is on disciplinary reassignment in maximum security housing.

Because Plaintiff was a pretrial detainee at the time of the alleged incidents, the protections from cruel and unusual punishment under the Eighth Amendment apply to him through the due process clause of the Fourteenth Amendment. "Due process requires that a pretrial detainee not be punished prior to a lawful conviction."[150]   The government, however, may subject those awaiting trial to the conditions and restrictions of incarceration so long as those conditions and restrictions do not amount to punishment.[151] The determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some other legitimate government purpose.[152] If an act by a prison official, such as placing the detainee in segregation, is done with the intent to punish, the act constitutes unconstitutional pretrial punishment.[153] Similarly, "if a restriction or condition is not reasonably related to a legitimate [governmental] goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment."[154] On the other hand, restraints that "are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting." Thus, "no process is required if [a pretrial detainee]

---

[150] *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1106 (10th Cir. 2005), opinion vacated in part on reh'g en banc, 449 F.3d 1097 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

[151] Id. (citing *Bell*, 441 U.S. at 536–37).

[152] *Id.*

[153] *Id.*

[154] *Id.*

is placed in segregation not as punishment but for managerial reasons."[155] A detention center has a legitimate interest in segregating individual inmates from the general population for non-punitive reasons, including "threat[s] to the safety and security of the institution."[156]

The record reflects that Plaintiff was placed in 9-Side's disciplinary segregation in February 2012 pending investigation of the incident where he was found attempting to ferment alcohol in a trash can in his cell.[157]  Defendants claim that between February 1, 2012 and May 31, 2012, Plaintiff was in 9-Side for a total of 50 days.[158]  Out of those 50 days, he had night shift recreation 26 times, with the other 24 during the day shift.[159] Plaintiff, however, claims that he was in 9-Side more than 90 days in the year 2012.  Although Defendants attempt to controvert this statement in their Response, they state that "Plaintiff was on 9-Side for 98 days in 2012."[160] There is no evidence presented as to the time of Plaintiff's recreation for the other 48 days he was in 9-Side.

Regardless of the actual number of times that Plaintiff was forced to take his daily allotted recreation time between midnight and 5:00 a.m., the Court finds that Plaintiff has no protected constitutional interest in the time of day when he could take his recreation time. Defendants admit that inmates in 9-Side's disciplinary segregation receive their recreation time

---

[155] *Id.* (citing *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002)).

[156] *Peoples*, 422 F.3d at 1106.  *See also Bell*, 441 U.S. at 540.

[157] Other than after the February 2012 incident, it is not clear from the record or briefing when Plaintiff was housed in 9-Side's disciplinary segregation unit or if he was housed there as a result of his filing kosher-diet-related grievances on March 22–23, 2012.

[158] Sybesma Aff. ¶24 (ECF No. 121-3).

[159] *Id.*

[160] Defs.' Resp. (ECF No. 144) at 2.

between midnight and 5:00 a.m., while inmates in administrative segregation receive recreation during day or evening hours. According to Defendants, 9-Side is used to house inmates, regardless of their classification, who would be inappropriate to house in the general population due to disciplinary issues or administrative reasons. They point out that the inmates housed in 9-Side are the most closely monitored because they pose a danger to the safety of themselves, other inmates and facility staff. Defendants have thus shown legitimate and non-punitive reasons for requiring Plaintiff to take his daily recreation time between midnight and 5:00 a.m.

Nor does the Court find that Plaintiff's allegations that he was forced to take his hour of allotted recreation time between midnight and 5:00 a.m. while he was in 9-Side's disciplinary segregation to constitute cruel and unusual punishment under the Eighth Amendment. These allegations are not objectively "sufficiently serious" to establish an Eighth Amendment claim, as they do not "result in the denial of the minimal civilized measure of life's necessities."[161]

With regard to the case cited by Plaintiff and his argument that *Dillard v. Pitchess*[162] stands for the proposition that "due process of law requires that a defendant not be denied the opportunity for a reasonable night's sleep before each day of his trial," Plaintiff can point to only one instance—on May 8, 2012—where he had a court hearing the same day he was forced to take his allotted one hour of recreation time between midnight and 5:00 a.m. Plaintiff does not dispute that his recreation time on May 8 was at 12:06 a.m. for 21 minutes. The Court does not find this one instance to rise to the level of a due process violation.

---

[161] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[162] 399 F. Supp. 1225, 1237 (C.D. Cal. 1975).

The Court therefore grants summary judgment to Defendants with respect to Plaintiff's section 1983 claim that he was subjected to cruel and unusual punishment and that his Fourteenth Amendment due process rights were violated by being forced to take his daily recreation period from 12:00 a.m. to 5:00 a.m.

## VI.  Plaintiff's Motion for the Appointment of Counsel (ECF No. 155)

Plaintiff has also filed a third Motion for Appointment of Counsel (ECF No. 155).  The Court has denied Plaintiff's two prior motions for the appointment of counsel.[163]  In the most recent motion, Plaintiff states that the legal material he was using to guide him through the litigation is no longer accessible as he was not allowed to take it with him when he transferred out of the Detention Center. Plaintiff also argues that this case could be a class action and if it was filed as such, counsel would have been appointed.  He asserts that the implications of the claims in this case will affect policies in county jails and prisons and should be properly presented by an attorney. He asks that if the Court denies his request for counsel at trial, then he requests counsel for pretrial preparations, such as preparing subpoenas.

As set out in the Court's prior Orders denying Plaintiff's motions for appointment of counsel, it is well settled that a party in a civil action, as opposed to a criminal action, has no right to appointment of counsel.[164] For actions with claims arising under 42 U.S.C. § 1983, courts considering requests for the appointment of counsel generally look to the *in forma*

---

[163] *See* Nov. 20, 2012 Mem. & Order (ECF No. 38) and July 26, 2013 Mem. & Order (ECF No. 105).

[164] *Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989).

56

*pauperis* statute, 28 U.S.C. § 1915.[165] Under § 1915(e)(1), a court "may request an attorney to represent any person unable to afford counsel." The appointment of counsel under § 1915(e)(1) is a matter within the discretion of the district court.[4] In determining whether to appoint counsel under § 1915(e)(1), the district court may consider a variety of factors, including: (1) the merits of the litigant's claims, (2) the nature of the factual issues raised in the claims, (3) the litigant's ability to present his/her claims, and (4) the complexity of the legal issues raised by the claims.[5]

Reviewing Plaintiff's present motion, as well as his other pleadings filed to date, under the above-referenced factors, the Court finds that Plaintiff's third request for appointment of counsel should be denied. Plaintiff has been able to litigate his case without the assistance of counsel for well over two years. Plaintiff has thus demonstrated that he has sufficient ability to present and prosecute his claims, as evidenced by his filing a motion for summary judgment and responding to Defendants' motion for summary judgment. Plaintiff should be able to continue to litigate this case, including presenting evidence at the court trial supporting his remaining claim for retaliation and for damages on the postcard-only policy claim, without the assistance of counsel. Plaintiff's third motion for appointment of counsel is therefore denied.

---

[165] *Lane v. Brewer*, No. 07-3225-JAR, 2008 WL 3271921, at *2 (D. Kan. Aug. 7, 2008); *Winston v. Simmons*, No. 01-3335-KHV, 2003 WL 21418359, at *8 n.7 (D. Kan. June 18, 2003).

[4] *Johnson v. Johnson*, 466 F.3d 1213, 1217 (10th Cir. 2006) (a district court has discretion to request an attorney to represent a litigant who is proceeding *in forma pauperis* under 28 U.S.C. § 1915(e)(1)).

[5] *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995).

**VII.     Plaintiff's Objection to Magistrate Ruling on Motion to Extend Discovery**

Also pending before the Court is Plaintiff's "Objection of Magistrate Ruling" (ECF No. 149), which the Court construes as a motion for reconsideration of the Court's January 14, 2014 denial of his motion to continue the discovery deadline.

District of Kansas Rule 7.3(b) permits a party to file a motion seeking reconsideration of a non-dispositive order within 14 days after the order is filed.  The motion to reconsider must be based on "(1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice."[166] The decision whether to grant or deny a motion for reconsideration is committed to the court's discretion.[167] A motion for reconsideration is appropriate if the court "has obviously misapprehended a party's position on the facts or the law;"[168] it is not appropriate as a "second opportunity for the losing party to make its strongest case, to rehash arguments or to dress up arguments that previously failed."[169]

The Court thus may grant reconsideration of a non-dispositive order if Plaintiff establishes one of the three enumerated grounds. Plaintiff argues that he submitted two discovery requests after the written discovery deadline.  He had submitted the second one previously but never received a response. He asserts that both discovery requests are short, simple and very necessary for purposes of summary judgment, and he could not adequately argue without responses to them.

---

[166] D. Kan. Rule 7.3(b).

[167] *Hancock v. Okla. City*, 857 F.2d 1394, 1395 (10th Cir. 1988).

[168] *McCormick v. Roberts*, No. 11-3130-MLB, 2012 WL 3542636, at *1 (D. Kan. Aug. 16, 2012).

[169] *Skepnek v. Roper & Twardowsky, LLC*, No. 11-4102-KHV, 2012 WL 5907461, at *1 (D. Kan. Nov. 26, 2012).

In this case, the Court finds that Plaintiff has failed to establish any grounds for granting reconsideration of the Court's denial of his motion for an extension of the discovery deadline. He has not pointed to an intervening change in controlling law, or any new evidence that he would have used to support his prior motion to extend the discovery deadline. Neither has he shown that reconsideration is needed to correct clear error or prevent manifest injustice. This case was removed to this Court on August 30, 2012. Plaintiff served his first request for production of documents on October 16, 2012 (ECF No. 35). Under the Scheduling Order, all discovery was to be served in time to be completed by November 29, 2013. After that deadline passed, Plaintiff served another set of Interrogatories and Request for Documents on December 17, 2013 (ECF No. 134). When Defendants objected that the requests were not served by the Scheduling Order deadline, Plaintiff then filed a motion to continue the written discovery deadline (ECF No. 138). Plaintiff had ample time to serve his discovery requests ahead of the discovery deadline. The fact that Defendants filed their motion for summary judgment and caused him to realize that he may need some additional discovery does not rise to the level needed for reconsideration. Plaintiff has not shown that reconsideration is needed to correct "clear error or prevent manifest injustice."

**IT IS THEREFORE ORDERED THAT** Defendants' Motion for Summary Judgment (ECF No. 120) is GRANTED IN PART AND DENIED IN PART. The Court grants Defendants' Motion for Summary Judgment in favor of Defendants on Count II (cross-gender camera monitoring) and Count IV (nighttime recreation time). The Court further grants summary judgment as to Count III (mail policies) for Defendants Denning, Prothe, and Cortright in their individual capacities. The Court denies Defendants' Motion for Summary Judgment on Count I

(retaliation for filing grievances) and Count III (mail policies) against Defendants in their official capacity.

**IT IS FURTHER ORDERED THAT** Plaintiff's Cross Motion for Summary Judgment (ECF No. 146) is GRANTED IN PART AND DENIED IN PART. The Court grants summary judgment in favor of Plaintiff as to Count III (mail policies) as to Defendants Denning, Prothe, and Cortright in their official capacities, finding the Detention Center's postcard-only policy impermissibly infringes upon Plaintiff's constitutional rights. The remainder of the motion is denied.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Appointment of Counsel (ECF No. 155) is DENIED.

**IT IS FURTHER ORDERED THAT** Plaintiff's "Objection of Magistrate Ruling" (ECF No. 149), which the Court construes as a motion for reconsideration of the Court's January 14, 2014 denial of his motion to continue the discovery deadline, is DENIED.

**IT IS FURTHER ORDERED THAT** Count I (retaliation for filing grievances) and Plaintiff's damages on Count III (mail policy) remain set for non-jury trial on January 20, 2015.

IT IS SO ORDERED.

Dated this 29th day of September 2014, at Kansas City, Kansas.

David J. Waxse
David J. Waxse
United States Magistrate Judge
